## The City Bank of New Orleans *v.* Houston et al.

Where one holding a mortgage on property offered for sale by order of a District Court of the United States, sitting in bankruptcy under the stat. of 19 August, 1841, never proved his claim in bankruptcy, and, though notified of the sale, from a wish to avoid recognizing the power of the court to sell mortgaged property, took no part in the proceedings, he will not be estopped from disputing the title of the purchaser. His conduct could not mislead or deceive any one.

A mortgagee not made a party to proceedings by which a judgment was obtained ordering the recorder of mortgages to erase the mortgage held by him, will not be bound by them.

The jurisdiction conferred on the courts of the United States in matters of bankruptcy, by the stat. of 19 August, 1841, is restricted to the unencumbered assets of the bankrupt, except where parties voluntarily apply to the court for relief, or remedies are sought to be enforced against them which are authorized by special provisions of that act. The object of that statute being the discharge of debtors from their debts, it affects only such rights of property as stand in the way of that object. The 11th sect. provides that the assignee may, under the authority of the court, redeem and discharge any mortgage or pledge, deposit or lien upon any property, real or personal, whether payable *in præsenti* or at a future day, and tender a due performance of the conditions thereof. The assignee may thus remove the encumbrance by satisfying the creditor, he may sell the property *cum onere*, or he may leave the creditor to exercise his rights at his option; but no power is given over such mortgage, pledge, deposit or lien, except to satisfy it, and thereby release the property. Sec. 2.

APPEAL from the Commercial Court of New Orleans, *Watts*, J. On the 30th June, 1837, Thomas Banks executed a mortgage in favor of the City Bank, for the sum of $55,000, giving his bond at twelve months for that amount, with privilege of renewal on payment of the stipulated instalments. The property covered by the mortgage consisted of ten lots of ground in the city of New Orleans, in the square bounded by Magazine, Gravier, Natchez and Tchoupitoulas streets, the description of which is contained in the mortgage, the whole forming the property known as Banks' Arcade. This mortgage was duly inscribed in the office of the recorder of mortgages. At the institution of this suit, there remained due to the City Bank on the above mortgage, the sum of $44,000, with interest, at eight per cent per annum, from the 30th June, 1842; and the object of the suit is to recover this amount by the sale of the mortgaged premises in the hands of the defendants, who are the present owners of the property, by purchase from the assignee of *T. Banks*, in bankruptcy.

On the 30th July, 1842, *Thomas Banks* filed his petition, praying to be decreed a bankrupt, in the District Court of the United States for the Eastern District of Louisiana. His schedule embraced the property subject to the mortgage of the plaintiffs, and the plaintiffs were named as creditors, by mortgage and pledge of stock, to the amount of $63,250. On the 5th September, 1842, the decree of bankruptcy was passed in due form, and *F. B. Conrad, Esq.* was appointed assignee, and gave bond accordingly. On the 23d December, 1842, the assignee presented his petition, praying for an order of sale of the estate of the bankrupt. An order was passed for the publication of the application, and the hearing was fixed for the 6th January, 1843.

In pursuance of certain rules adopted by the United States District Court, notice was also directed to be given to certain mortgage creditors, and, among others, to the City Bank. The tenor of this notice is as follows:

"The assignee of said estate having filed in the court a petition as above described, it is ordered by the court, that a hearing of the said petition be had on thursday, the 5th January, 1843, at 10 o'clock, A. M., when, as one of the mortgage creditors of said estate, you are notified to appear, and show cause why the said assignee should not be authorized to erase and cancel all the mortgages, judgments and liens recorded in favor of *certain creditors of said estate*, so that he may convey a clear and unencumbered title to any purchaser thereof, reserving to such creditors all their rights in law to the proceeds of the sale of the said property upon the final distribution thereof, and why the said property should not be sold in the manner and form, and upon the terms suggested by the assignee, as particularly set forth in the schedule annexed to his petition, and filed in court." And by the return of the marshal, it appears that a copy was served upon the City Bank by its cashier, on the 29th December. No proceeding was had on the 5th January. On the 6th January, 1843, an order was granted, authorising the assignee to sell the property of the bankrupt, on terms therein fixed; and, after reciting that certain mortgagees, the City Bank among others, had been served with notice, and made no opposition, the assignee was authorized "to cause to be erased and cancelled from the records of the office of mortgages, the mortgages recorded in favor of the said creditors, reserving to them all the rights in law to the proceeds of the sale upon the distribution thereof." Neither the rule, nor the order of the court *specified the mortgages to be raised*. On the 24th February, 1843, a further order was granted, at the instance of the assignee, and without notice or rule to show cause, suggesting that, in pursuance of the orders of the court, he had caused to be sold the property known as Bank's Arcade; that the New Orleans Canal and Banking Company, which held the first and oldest mortgage upon said property, had given to the said assignee a written consent that the same should be sold, and its mortgages be raised; that the application to sell, and to raise the mortgages, had been notified to the New Orleans and Carrollton Railroad Company, owners of the second mortgage, and to the City Bank, owners of the third mortgage, and that no objection had been made by them. It was thereupon ordered, that the recorder of mortgages should erase from his records *the mortgages upon said property in favor of said banks*. This order was accompanied with a description of the property, and a statement of the mortgages referred to, by date, amount, &c.

On the 6th March, 1843, the assignee presented his petition to the Parish Court for the parish of Orleans, reciting the aforesaid orders of the United States District Court sitting in bankruptcy, and the sale made by the assignee in pursuance of said orders; that said assignee had presented to the recorder of mortgages duly authenticated copies of said orders and proceedings, and had demanded the erasure of said mortgages, and a clear certificate, but that the recorder had refused to comply with said demand "alleging that the judgment of the District Court of the United States was invalid, and of no legal force or effect." The assignee prayed that the recorder might be cited to show cause, within three days, why a writ of *mandamus* should not issue, commanding him to cancel said mortgages, and grant the certificate as demanded. Service of this petition was accepted by counsel for the recorder, but no written answer was filed; and, on the 10th March, 1843, the *mandamus* was granted. On the 21st March, 1843, an appeal was taken by the recorder; and the judgment of the Parish Court was affirmed, on the 29th May. On the 23d June, 1843, the New Orleans Canal and

Banking Company filed a petition in the United States District Court, reciting that they held the first mortgage upon the Banks' Arcade property, to the amount of $102,000, besides interest; that the property had been sold by the assignee, who was in possession of the proceeds in cash and notes, the amount of which was less than their mortgage debt; that they were willing to receive the proceeds on account; and praying that the assignee be cited to show cause why the same should not be paid. To this petition an answer was filed by the assignee, declaring that he was willing to make the payment on the order of the court, and after deducting expenses of the sale. An order of publication of this petition was passed, and the hearing fixed for the 6th July, on which day a decree was rendered in conformity with the prayer. On the 5th January, 1844, on motion of the assignee, notice was ordered to be given by publications, that, on the 18th instant, the several reports filed by the assignee would be referred to the commissioners in bankruptcy; and calling upon creditors who had not proved their debts, to do so before that date. On the 8th April, 1844, a notice was issued addressed to the creditors who had proved their debts, and the return of serservice endorsed shows that it was notified to twenty-three creditors, but the name of the plaintiffs is not on the list. The object of this notice was to call upon said parties to show cause, on the 18th of April, why the report of commissioners should not be approved. The report in question includes, among those who had not proved their debts under the commission, the plaintiffs, as creditors, by loans on mortgage and on pledge of stock, for the sum of $63,250. The proceeds of the Arcade, amounting to $123,650, were awarded or confirmed to the Canal Bank, as the first mortgagee. An order was also made for the publication of the rule, and all persons interested were called upon by the publications to show cause why the report so filed should not be homologated and approved. On the 18th April, 1844, the report was approved and homologated.

The adjudication of the property, by the assignee, to the defendants, took place on the 15th February, 1843, after publications in the newspapers, and posting of hand-bills. The acts of sale were passed on the 7th June, 1843, the delay being caused by the proceedings to raise the mortgages, and the defendants have admitted, of record, that they refused to receive acts of sale, or to comply with the adjudication, until a clear certificate could be produced. The mortgages were cancelled by the recorder. after the decree of the Supreme Court was pronounced, although no writ of *mandamus* was issued or served upon him, nor was the decree of the Supreme Court filed in the Parish Court.

The plaintiffs did not appear, and were not represented in any of these proceedings, either in the United States District Court, the Parish, or the Supreme Court. No notice or citation was served, except that referred to above; nor did the plaintiffs ever make or file any proof of debt, in conformity with the provisions of the bankrupt act, in the court sitting in bankruptcy. *Thomas Banks* received his discharge in bankruptcy, in December, 1843. The plaintiffs pray that the mortgaged premises in the hands of the defendants may be subjected to their claim, and seized and sold to satisfy it.

Several exceptions were filed, among them, one to the jurisdiction, on the ground that exclusive jurisdiction in all matters of bankruptcy was vested in the federal courts. The others set up the validity of the proceedings under which the defendants had purchased. The exceptions were overruled, with leave to plead the same matters in defence. The defendants then filed separate answers, which present, in different forms, the same defence. The sub

stance of the defence in all of them is, that defendants had acquired the property in good faith, at a public adjudication, in pursuance of a decree of a competent court, rendered after due proceedings, and with a clear certificate of the recorder of mortgages; that they had severally paid the amount bid by them for the lots; that, by reason of the bankruptcy and discharge of *Thomas Banks*, and of the proceedings touching the sale, and raising of mortgages in the Court of Bankruptcy, and in the Parish and Supreme Courts, by all of which the rights of the plaintiff were bound and concluded, the mortgage had been extinguished and legally cancelled; and, that the property was free of any lien or charge for the same. The defendants also plead, that the City Bank was "conusant" of all these proceedings, and was therefore bound by the knowledge and notice of the same. The assignee in bankruptcy, the Canal Bank, and the recorder of mortgages, were cited in warranty. The recorder only answered, relying upon the decree of the Supreme Court; and no further steps were taken against the warrantors.

During the trial of the cause, and after the evidence had closed, the plaintiffs filed a supplemental petition, in the nature of a replication to the rights set up by defendants under the proceedings in bankruptcy, to the effect, that the rights of mortgagees were specially reserved and exempted from the operation of the bankrupt law, by the proviso of the second section of the act; to the filing of which the defendants excepted, on the ground that it was filed too late, and after the trial had commenced.

The transcripts of the judicial proceceedings above referred to, the procès-verbal, and acts of sale to the defendants were introduced. Witnesses were sworn,to prove the degree of publicity given to the sale; that the sale by lots produced more than would have been produced by a sale in block; and that the president and cashier, and attorney of the City Bank knew, before the sale, that one was intended. *Peters* proved, that after the adjudication, and before passing the acts, an application was made by *Hullin* to the City Bank, to release its mortgage, on the ground that the proceeds of sale were insufficient to pay the Canal Bank, holding the first mortgage, but that this proposition was not acceded to. He also stated, that the Bank took no part in any of the proceedings touching the sale, or the cancelling of the mortgages.

Judgment was rendered for the defendants, and the plaintiffs have appealed.

*Lockett* and *Micou*, for the appellants. The question to be decided is, whether the mortgage granted by Thomas Banks to the plaintiff has been legally cancelled, so as to exempt the property, in the hands of the defendants, from its operation. The grounds on which the defendants rely, to protect the property from the mortgage, may be classed as follows, viz. : 1. The certificate of the recorder, that there were no mortgages. 2. The sale made by the assignee. 3. The orders of the United States District Court, requiring the recorder to cancel the mortgage. 4. The mandamus directed to the recorder by the Parish Court, affirmed by the Supreme Court. 5. The neglect of the bank to oppose these orders, and an alleged acquiescence resulting from such neglect. We will notice, in their order, these several grounds.

I. The recorder cannot destroy a mortgage by a certificate. His certificate is only *prima facie* evidence. After the mortgage has been recorded, it cannot be cancelled, except in accordance with law. *Dreux* v. *Ducourneau*, 5 Mart. 627.

II. The assignee received the property subject to the mortgage, and could only convey it to the purchasers subject to the same incumbrance. Bankrupt Act, secs. 3, 15. *Ex parte Remlin*, Jus. Baldwin. *Norton's Assignee* v. *Boyd*, 3 Howard, 440. *Succ. Field*, 3 Rob. 5. *Savery's Assignee* v. *Best*, 3 Howard, 118. *Egerton* v. *Creditors*, 2 Rob. 201. *Foley* v. *Dufour*, 17 La. 526. *Bertoli* v. *Citizens' Bank*, 1 Ann. Rep 119.

CITY BANK          III. The United States District Court was wholly without jurisdiction to
*v.*            order the release of mortgages, or to compel the appearance of mortgagees.
HOUSTON.        Bankrupt Act, secs. 6, 8.  *P ck* v. *Jenness*, Parker, J., Law Rep., Dec. 1845.
*City Bank* v. *Christy*, Baldwin, J., Penn. Law Rep.  *Hubbard* v. *Hamilton*,
7 Metcalf, 346.  *Ex parte Cook*, 5 Law Rep.  The mortgage of the City Bank
is protected by the provisions of its charter, and the exemption of the second
section of the bankrupt act.  Charter, act of 1831.  *Bertoli* v. *Citizens' Bank*.
1 Ann. Rep. 119.  The judgment of a court. without jurisdiction *ratione materiæ*,
is absolutely null.  *Thompson* v. *Tolmie*, 2 Peters. 169.  *Voorhies* v. *Bank of
United States*, 10 Peters, 449.  *Spencer* v. *Barbour*, 5 Hill, 570.  *Beale's
Heirs* v. *Walden*, 11 Rob. 67.

IV. The recorder alone was cited.  The rights of the bank could not be
destroyed in a suit to which it was not a party.  *Bank of Alabama* v. *Hozey*,
2 Rob. 152.  *Cox* v. *Rees*, 16 La. 110.  *Vignié* v. *Blache*, 5 Ibid. 108.  *Hel-
lum* v. *Maurin*, 8 Ibid, 113.  *French* v. *Prieur*, 6 Rob. 302.  *State* v. *Leblanc*,
5 La.  *Gasquet* v. *Dimitry*, 6 Ibid, 283.

V. Citation is the only basis of judicial proceedings; mere notice of their
existence will not bind third parties.  *Wall* v. *Wilson*, 2 La. 172.  *McMicken*
v. *Smith*, 5 Mart. N. S. 429.  The bank had no notice, except of the sale : to
this it had no objection, and had no interest in opposing it, because by law the
sale did not impair the mortgage.  Acquiescence could only be presumed from
conduct not susceptible of any other interpretation.  The conduct must be such
as to mislead the parties interested, and such that ratification necessarily results.
*Riva's Heirs* v. *Bernard*, 13 La. 175.  Story's Eq. Jurisp. § 307, and cases.
Drewry on Injunctions, 38 Law Lib. 45.  *Greig* v. *Bartlett*, 20 Pickering, 186.
*Cook* v. *West*, 3 Rob. 331.  So far from consenting, the bank positively refused
to release its mortgage.  Its position was well known.  The purchasers were
perfectly informed of the existence of its mortgage.  The value of the proper-
ty was necessarily affected by the claim, and the defendants had the benefit of
the reduced prices resulting from a sale under a clouded title.  They speculated
upon the chances of destroying the bank mortgage, without its consent; and,
even if they fail in this speculation, their bargain in the property will indemnify
them for the loss.  It results, that the mortgage of the bank has never been le-
gally disturbed or impaired, but remains in full force.  The judgment of the
Commercial Court should therefore be reversed, and a decree rendered, con-
demning the property to be sold, to satisfy the mortgage.

*R. H. Wilde*, on the same side.  The plaintiffs, at the time of Banks' bank-
ruptcy, held *a good, valid and subsisting mortgage* on the Arcade, *the lien of
which was saved* by the proviso to the 2d sect. of the bankrupt act.  *Nugent*,
assignee of Norton v. *Boyd*, 2 Howard.  *Ex parte Kerlin* (Judge Baldwin's
decision).  *Ex parte Cook* (Judge Story), 5 Law Rep. 445.  Eden on Bank-
ruptcy, 290, 294, 298, 306, 111, 304.  2 Black. Com. 467.  Cullen on Bank-
ruptcy, 145, 185.  Plaintiffs have *not* proved the debt against the bankrupt's
estate, do not claim *under* the bankruptcy, but *adversely to it*, and are in no wise
subject to the *jurisdiction* of the District Court of the United States, exercis-
ing *summary jurisdiction* in matters of bankruptcy.  *As to the effect of proof*,
see the 5th, 3d and 10th section of the bankrupt act.  *Briggs* v. *Stephens*, Law
Rep. Oct. 1844, p. 281.  *Dutton* v. *Freeman*, 5 Ibid. 452.  *Ex parte Comstock*,
5 Ibid. 165.  Over a creditor who does not prove, the jurisdiction, as we contend,
is not *summary*, but *formal*.  *Two kinds of jurisdiction created by the act*, one
by the 6th, one by the 8th section.

Distinction between *formal* and *summary jurisdiction of courts*, well estab-
lished.  2 Chitty's Gen. Prac. 312, 314.  This *distinction* clearly pointed out
by Judge Baldwin in regard *to our bankrupt act*, in *Kerlin's case*.  The United
States courts have no jurisdiction but what is expressly given to them.  *Taylor*
v. *Cooke*, 2 McLean's Rep. 516.  *Steamboat Orleans* v. *Phœnix*, 11 Peters, 184.
The *English High Court of Chancery*, *sitting as a bankrupt court*, cannot call
before it a *second mortgagee* who has not proved his debt.  *Ex parte Jackson*,
5 Vesey, jun. 357.  *Ex parte Bignold*, 1 Deacon, 503.  1 Deacon, 383.  1 Glyn
and Jameson, 4, and 260.

That the United States District Court, sitting as a bankrupt court, and exer-
cising summary jurisdiction in matters of bankruptcy, had *no lawful power, ju-
risdiction or authority* to order the *erasure of the plaintiffs' mortgage*, is a mere
logical deduction from the foregoing premises.

On the *rule* taken against the *recorder of mortgages*, in the *Parish Court*, and in the *appeal* thereon, *plaintiffs* were *not* made a *party*, and *are in no wise bound thereby*. In *a rule* against the *recorder of mortgages, the mortgagee must be a party*. *Florance* v. *Mercier*, 2 La. 487. *Waters et al.* v. *Mercier*, 4 Ibid. 17. *Gasquet* v. *Dimitry*, 6 Ibid. 453. *Cox* v. *Rees*, 16 Ibid. 110, 111. *Foley* v. *Dufour*, 17 Ibid. 526. *Barthe* v. *Bernard*, 1 Rob. 397. *Bank of Alabama* v. *Hozey*, 2 Ibid. 150, 152. *Le Goaster* v. *Barthe*, 2 Ibid. 390. *Ex parte* proceedings not binding on those not parties. 1 Rob. 116, 17 La. 14. 5 Ibid. 122.

The Bank, *by the express provision* of its *charter*, is *exempted*, in regard to *mortgages*, from the operation of the *State insolvent laws*, and the *saving* of the *proviso* to the act of *Congress*, being a *saving* of the *State lien in its full integrity*, they are, *as to such lien, and its remedies, exempted* by the *said proviso* from the *operation* of the *bankrupt act* likewise. For the charter of the City Bank, granting the same privileges, &c., with the Bank of Louisiana, and the Consolidated Association, see Acts of 1831, p. 38, sec. 18. For charter of Bank of Louisiana, see Moreau's Dig. vol. 1, p. 35, secs. 35, 34, 33, 31. For charter of Consolidated Association, see 2 Moreau, p. 404, secs. 25, 24, 22. Analogous to mortgages with a *pact de non alienando*. *Williams* v. *Bank of Louisiana*, 17 La. 378, 379. *Egerton et al.* v. *Their Creditors*, 2 Rob. 203. The privileges of the bank net affected by a syndic's or probate sale. *Bertoli* v. *Citizens' Bank*, 1 Ann. Rep. 119.

*F. B. Conrad*, for the defendants. The pretensions of the plaintiff are founded mainly upon an alleged want of jurisdiction in the District Court of the United States, as a court of bankruptcy, over property encumbered with liens and mortgages; and it is contended, that the sale by the marshal, and the judgment of the court ordering the cancelling of the mortgages, and the cancelling thereof by the recorder of mortgages, did not operate an erasure of the mortgage of the plaintiffs.

Whatever may have been once thought of such pretensions, the question as to the jurisdiction of the bankrupt court must now be considered as definitely settled by the highest judicial authorities, both of this State and of the United States. Immense interests have been acquired; property of incalculable extent and value is held upon the faith of those authorities; and public policy, and a sound administration of justice require, that the question should no longer be considered an open one.

The defendants, therefore, hold that, the District Court of the United States had full authority and jurisdiction in the premises, and was competent to decree the sale of the property and the cancelling of the mortgages. *Walker* v. *Best*, 3 Howard's Reports, 111. *Ex parte The City Bank of New Orleans* v. *Christy's Assignee*, 3 Ibid, 292. *Norton's Assignee* v. *Boyd et al.*, 3 Ibid, 434. Opinion of Judge Story, in the matter of *Jonathan H. Cheney*, 5 Law Reporter, 19. "A creditor of a bankrupt, who holds collateral security for his debt, may, in the discretion of the District Court, be permitted to take the same at its value, to be ascertained under the direction of the court, or the District Court may order a sale thereof." In the matter of *B. B. Grant and others*, 5 Law Reporter, 303. *Clarke, assignee*, v. *Rosenda et al.*, 5 Robinson, 27. *Conrad, assignee*, v. *Prieur, recorder*, &c., 5 Ibid, 49. *Lewis* v. *Fisk et al.*, 6 Ibid, 159.

*L. Pierce*, on the same side. The conduct of the bank has deprived it of the right to contest the sales under which defendants claim. The evidence on this subject is as follows: *Samuel J. Peters* says, "that he is, and has been for many years, president of the City Bank." Being asked whether, as president of that bank, he knows whether any particular course was resolved upon by that institution with regard to the debt due by *Thomas Banks* to that institution, and if so, for what reasons, and on what account it was adopted, and how continued? he says that, "at the time of the failure of *Thomas Banks*, he owed the City Bank about $44,000; that that debt was secured by mortgage on the Arcade property: there were other mortgages before that of the City Bank on the property, those of the Canal Bank, and that of the Carrollton Bank. The City Bank never proved its claim on *Banks' estate in bankruptcy, by advice of counsel*, and pursued the same course in all similar instances; the bank *was advised by counsel that the mode of selling the property* was of doubtful legality. Subsequent to the sale of *that* property, some difficulty having

CITY BANK
*v.*
HOUSTON.

arisen about raising the mortgages, and giving a title to the *Arcade*, the City Bank was applied to by *Mr. Hullin*, with a proposition that the bank should authorise the erasure of the mortgages, on the ground that the property had been sold, and had not produced more than enough to pay the Canal Bank. That proposition was referred to the counsel of the bank; the bank was advised not to accede to it; the bank did not accede to it. The City Bank never opposed in any bankrupt case when it was in possession of a mortgage, as witness thinks, this being the settled course of the bank, under advice of their counsel; not wishing, in any case, to recognize the power of the bankrupt court to sell the property mortgaged."

*Palfrey*, the cashier, testifies that, he "was fully aware that the property was to be sold; saw the advertisements of the sale in the newspapers; the president, *S. J. Peters*, attended to the business of the real estate of the bank."

The law on this subject is laid down in the case of *Marsh* v. *Smith*, 5 Robinson, p. 523 and 524, where the court say:

"The principle invoked by the defendants' counsel is one well settled, that if a man stands by and is silent while his own property is sold, and suffers another to become the purchaser, he is estopped from disputing a title thus acquired. The rule of law is well expressed by Lord Denman, in the case of *Pickard* v. *Sears*, (6 Adol. & Ellis, 469,) to wit, that where one by his words or conduct wilfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time.

"'There are cases,' says Judge Story, in his Treatise on Equity, 'in which a man may innocently be silent; but in other cases, a man is bound to speak out; and his very silence becomes as expressive as if he had openly consented to what was said or done, and had become a party to the transaction. Thus, if a man, having a title to an estate, which is offered for sale, and knowing his title, stands by and encourages the sale, or does not forbid it, and thereby another person is induced to purchase the estate, under the supposition that the title is good, the former, so standing by and being silent, will be bound by the sale, and neither he nor his privies will be at liberty to dispute the validity of the purchase.' 1 Story on Equity, 375, § 385. 3 Robinson, 332. 1 Johns. Chanc. Rep. 354. We cannot but conclude that, the present case comes within the principle thus laid down, and especially the great principle of equity, that where one of two innocent persons must suffer, he shall suffer who, by his own acts, occasioned the confidence and the loss."

To the same effect also is the case of *Miles Beach* v. *John McDonogh*, 5 Robinson, 252, *et seq.*

*C. M. Randall, Roselius* and *C. M. Conrad*, on the same side.

The judgment of the court was pronounced by

EUSTIS, C. J. This is an hypothecary action, in which the creditor asks for a decree subjecting certain property in the possession of the defendants to the payment of his debt. The defendants plead in substance that they purchased the property at a judicial sale, made of a bankrupt's estate, under a decree of the bankrupt court, with a clear certificate of the recorder of mortgages that the proceedings in bankruptcy were regular, and that by reason thereof and the discharge of the bankrupt, and by the decrees of the bankrupt court, the mortgage was extinguished and lawfully cancelled, and the property released from any charge or incumbrance resulting therefrom. That they were *bonâ fide* purchasers and paid the purchase money; and that the City Bank was cognisant of the sale and of all the proceedings in bankruptcy, and is bound by notice and knowledge of the same. There was judgment for the defendants, and the plaintiffs have appealed.

The transcripts of the different proceedings and the other documents have been so methodically set forth in the printed statement furnished in the brief of the counsel for the plaintiffs, that it would be useless to give any

further analysis of them.* We proceed to give our decision on the different questions of law which this interesting case presents.

I. We do not consider that there is anything in the conduct of the officers of the bank, as it is before us in evidence, which would bind the bank by the sale of the mortgaged property. They acted on their view of the law consistently throughout—misled no one, deceived no one. The different opinions among professional men in relation to the powers of the bankrupt court are matters of notoriety, and prevented any one from acting otherwise than with caution and deliberation in the purchase of mortgaged property at bankrupt sales. It is impossible for us to overlook a fact which thus excludes the plaintiffs from the operation of the salutary and equitable rule invoked by the counsel for the defendants.

II. The late Parish Court for the parish and city of New Orleans, at the instance of the assignee of the bankrupt, rendered a judgment against the recorder of mortgages, by which the latter was ordered to cancel the mortgage which is the subject of the present suit, and to grant a certificate of no mortgage. On an appeal the judgment was affirmed. The plaintiffs were not parties to those proceedings and are not bound by them, and the mortgage in question existing on the property at the time of the sale and afterwards, unless released by the decree of the bankrupt court, or by the sale itself, so far as the defendants are concerned, must be considered, for all the purposes of this enquiry, as subsisting.

III. The power and jurisdiction of the bankrupt court in this respect must be next considered. This is a case in which the bankrupt court, at the instance of the assignee, without the consent of the mortagage creditor, ordered mortgaged property to be sold, and the mortgage to be cancelled in the manner authorized by our laws in a *concurso*, considering the assignee as vested with the same authority as is exercised by syndics in the settlement and liquidation of insolvent estates under the *cessio bonorum.*

The argument presents two antagonist systems as the true theory of the bankrupt act of 1841, and we have to decide between them. One gives to the bankrupt court an unlimited and absolute control over all mortgages, liens, privileges and encumbrances on all the property surrendered by the bankrupt; the other confines its jurisdiction to the unencumbered assets belonging to the bankrupt, except in cases in which parties may voluntarily apply to the court for relief, or remedies may be sought to be enforced against them which are authorized by special provisions of the bankrupt act.

The different opinions entertained by enlightened and learned men on this subject attest its difficulty; and we are relieved by their researches from the labor, and, in some degree, the responsibility, of determining the question as *res nova,* by having it in our power to adopt one of the conflicting theories, under the convictions which the full discussion of the whole subject has produced on our minds.

Without drawing into question the constitutional power of Congress, under the authority to establish an uniform system of bankruptcy throughout the United States, to vest the jurisdiction in the bankrupt court, which is contended for by the counsel for the defendants, it is not a little singular that, for these absolute powers contained in such a jurisdiction over the property of third persons, the

---

*The statement of the case made in this report, is condensed from that referred to as prepared by *MM. Lockett* and *Micou,* counsel for plaintiffs.

CITY BANK
*v.*
HOUSTON.

exercise of which depends upon the will of any one who chooses to apply for the benefit of the act, there is no express warrant in the act itself, nor are these powers necessary to carry it into effect.

The object of the bankrupt law was to discharge debtors from their debts. An artificial state of things was supposed to require the great remedy of *novæ tabulæ.* This was the purpose of the act; and there was neither reason nor policy in touching any other rights of property than those which stood in the way of this object. The proviso contained in the second section, if it mean anything, must mean this. It says "that nothing contained in this act shall be construed to destroy, annull, or *impair* any lawful rights of married women or minors, or any liens, mortgages or other securities on property, real or personal, which may be valid by the laws of the States respectively, and which are not inconsistent with the provisions of the second and fifth sections of this act." So far from the act providing for the protection of these rights under its operation, they are expressly excluded from its benefit. All who prove their debts under the act must share alike, with the exception of the United States, those subrogated to their rights, and certain operatives for their wages not exceeding $25.

The proviso of the second section is scarcely more explicit and positive than that which exempts fiduciary debts from the operation of the bankruptcy. Mr. Justice McLean, in the case of *Chapman* v. *Forsyth,* 2 Howard 208, in speaking of that class of debts says: "But as the discharge operates only on debts, contracts, etc., which are provable under the act, it is said that consent cannot include fiduciary debts."

"Such debts without the assent of the creditor, are clearly not within the act. But if his debt shall be found on the schedule, and he not only proves it, but receives his proportionate share of the dividend, he is estopped from saying that it was not within the law. *He is a privileged creditor,* and is not bound by the bankrupt law; but he may waive his privilege. As a creditor he has a right to come into the bankrupt court, and claim his dividend. He does not establish his claim as a fiduciary one, but as a debt proveable within the statute; and, having done this, he can never controvert the discharge." Vide also, *Morse* v. *City of Lowell,* 7 Metcalf, 155. If the mortgage creditor prove his debt under the act, he can only receive a dividend with the other creditors. This, of itself, excludes the conclusion that, the mortgaged property must be sold in the bankrupt proceedings.

Section 11 is coincident with, and justifies this construction. It provides that the assignee shall have full authority, under the court in bankruptcy, to redeem and discharge any mortgage, or other pledge, or deposit, or lien upon any property, real or personal, whether payable *in presenti* or at a future day, and to tender a due performance of the conditions thereof. By this means the encumbrances being removed, the property belongs to the creditors, and is to be divided rateably among them; but no power is given over the mortgage, pledge or lien, except to satisfy it, and thereby release the property. This is all that can be done by the court in bankruptcy.

If this be not the true construction of the bankrupt act, it certainly recommends itself by its extreme simplicity, by its accordance with the general tenor of the act and its evident purpose and intendment, and its conformity with every one of its provisions, and its opposition to none. It gives the debtor all the relief he is entitled to ask; it discharges him from his debts personally, but

leaves the rights of his creditors on property affected by his debts, unimpaired. It leaves the State tribunals in the full exercise of their jurisdiction, except so far as that jurisdiction is divested by the constitutional power of the bankrupt court—with full and complete authority to carry into effect an uniform system of bankruptcy, and prevents that accumulation of power in the bankrupt court, which is to be exercised without appeal, and which we cannot believe the act confers.

Some weight is attempted to be given to the contrary construction of the act, from the mode of proceeding under our system of insolvency; but it has no affinity with the bankrupt act. The system of bankruptcy must be uniform throughout the United States. The enquiry is, as to the jurisdiction conferred by the act on the bankrupt court; the powers of assignees and of the bankrupt court, must be determined by its provisions.

We find them adequate for their object, consistent, and carrying out well recognised and constitutional powers. If the assignee finds that the property of the debtor is encumbered, he is authorized to remove the encumbrance by satisfying the creditor; he can sell it *cum onere*, or he can leave the creditor to exercise his right against it at his option; but we find nothing which authorizes the bankrupt court, under this act, to annul any mortgage, lien or security, reserved, as we consider, under the proviso of the second section of the act.

It is also worthy of remark that, it is surprising that in so elaborately prepared a statute as the bankrupt act, no single provision is made for the mode of exercise of this jurisdiction over pledges, liens and mortgages, for which the necessity was evident. Nor can this omission be considered as an oversight, for the act bears in every part the proof of great care and foresight. In the 11th section the assignee is not even authorized to compound or compromise any debts or securities due or belonging to the bankrupt, except under the authorization of the court, after ten days public notice in a newspaper. The rules of court for proceedings in bankruptcy, prepared under the direction of the Supreme Court of the United States, contained no provision on this important subject.

Such being the view we have taken of the act itself, it now remains to examine the authorities cited. The principal cases on which the appellees have based their argument, in favor of the powers of the bankrupt court under which the mortgages in this case were released, are those of *Ex parte Christy* (3 Howard's Reports 293,) and *Norton's assignee v. Boyd*, (3 Howard, 427.) Those cases were decided in 1845, and were preceded by two cases decided by the late Supreme Court of this State. *Clarke v. Rosenda*, (5 Robinson, 27) and *Conrad, assignee, v. Prieur, recorder of mortgages*, (Ib. 49,) which it is material to notice. The cases decided in the Supreme Court of the United States were both from the Louisiana district, and it is apparent, from the argument of counsel and the opinion of the court, that the decisions of our own court were not without influence in leading the learned judges of the Supreme Court of the United States to the conclusions to which a majority of them arrived.

The Louisiana decisions maintain the extraordinary powers asserted by the bankrupt court to their full extent. But they were made by a bare majority of the court. Judge Martin took no part in the causes, and, on both occasions, Judge Bullard gave a formal and emphatic dissent to the opinions of the court, and supported his views by a thorough and eleborate examination of the sub-

ject, which we consider unanswerable as a sound exposition of the legal intendment and construction of the bankrupt act.

We think these decisions are founded on two capital errors. One is in taking it for granted that the bankrupt act is in its administration identical with our Louisiana insolvent system, and that all the powers given by our laws to our courts for the liquidation of insolvent estates are given by the bankrupt act to the bankrupt court, which is no less than assuming the very point in dispute. This assumption is founded on a supposed necessity, which authorizes the recognition of implied powers. It is obvious that no such necessity exists, and a very slight examination of the subject will satisfy any one that the supposition is chimerical.

Another error consists in considering the mortgage under our laws, as different from mortgages as they exist in other parts of the Union. But under the bankrupt act, the proceedings in the bankrupt court are, according to the rules and principles of equity; and equity considers mortgages, as our laws consider them, simply as the security for a debt or obligation, 3 Blackstone Com. 435. The distinction between the two is without a difference, so far as relates to the action of a court of equity upon them. And in relation to the supposed necessity of releasing the mortgages in order to facilitate the liquidation of the bankrupt's estate, we have only to refer to the operation of the bankrupt act in States other than Louisiana, in which the absolute control of the bankrupt court over mortgages has never been asserted; nor is any such necessity supposed to exist under the English system of bankruptcy.

The opinion of the Supreme Court of the United States in *Christy's* case, was delivered on an application for a prohibition to the District Court of Louisiana, and it was held that the court had no authority to issue writs of prohibition except in the cases provided for by the statute, that is, where the district courts were proceeding as courts of admiralty and maritime jurisdiction. The application being in a case in bankruptcy, was disallowed.

The doctrinal portion of this opinion supports the jurisdiction of the bankrupt court to the extent contended for by the counsel for the appellees, and it seems to be affirmed in the subsequent case of *Norton's assignee* v. *Boyd et al.* The opinions in these cases do not come before us in such a form as to command an acquiescence, and to demand from us a sacrifice of conscience and of our sense of duty to authority.

Being entirely aloof from those feelings which controversy rarely fails to engender, even with those who are the most anxious to avoid its effects, we have not stated in detail the objections to which we think the opinion of that high tribunal is obnoxious. There is one, however, which it will not, we hope, be considered out of place, if we submit.

The Supreme Court has never decided that the jurisdiction of the bankrupt court was exclusive of the State courts. The point was reserved in *Norton's* case, and the general exercise of the jurisdiction of the State courts on liens and mortgages, we think, renders its lawfulness unquestionable. In order to enable the bankrupt court to liquidate an estate, according to the doctrine in *Christy's* case, to class and settle the rank of the privileges and mortgages, to ascertain and give their relative position to the different liens existing under our laws, the jurisdiction must be exclusive, the power must be absolute. A conflicting authority is irreconcileable with a speedy settlement, and leads to litigation and delay, which, it is admitted on all hands, the bankrupt act repudiates

throughout. The only mode by which estates can be settled within a reasona-<br>
ble time, under that act, is by leaving it to operate upon the unencumbered assets<br>
of the bankrupt, and enabling those who have rights of property to exercise<br>
th em in the ordinary tribunals, as their interest or inclination may prompt them.<br>
The necessity of making the jurisdiction exclusive, in order to enable the sys-<br>
tem to work out its own ends, appears to us so obvious, that we cannot consider<br>
that a matter of this importance would be omitted, or even left in doubt, by the<br>
distinguised authors of this remarkable law. We cannot belive it was left to be<br>
implied, and that such a delegation of power, exclusive and without appeal, over<br>
the property of citizens, should be assumed or vested otherwise than openly,<br>
expressly, and in a formal manner.

So much has been before the public on this question that anything further on<br>
our part would be merely an exhibition of what has been previously said, and<br>
it only remains for us to state our thorough conviction of the correctness of the<br>
views taken of it in the cases cited by Judge Bullard, in his dissenting opinions,<br>
and which we adopt as an expression of our own.

In witholding our assent to the opinion given in *Christy's* case, we are far<br>
from considering that we, in any one single point, derogate from the respect<br>
which we owe and feel for the memory of the illustrious judge who delivered<br>
it, or for that august tribunal from which it emanated. We are acting under the<br>
stern responsibility of duty, and under the consolation that, if our views are<br>
sound, they will be sustained, and if erroneous they will be corrected by the<br>
superior wisdom of those who will be called upon to decide this case in the last<br>
resort.

There is a fastidious and irrational delicacy, which shrinks from the examina-<br>
tion of every thing which bears the semblance of authority; but following the<br>
example of that court itself, and the lights which it holds out to those who are<br>
in pursuit of truth, we have considered this important subject with great care<br>
and solicitude, and cannot refuse to the party litigant the benefit of our con-<br>
scientious and deliberate convictions.

In the case of the *Louisville Railroad Company* v. *Letson* (2 Howard, 554),<br>
Mr. Justice Wayne, in delivering the opinion of the court, says:

" We remark too, that the cases of *Strawbridge* and *Curtis* and the *Bank*<br>
and *Deveaux*, have never been satisfactory to the bar, and that they were not,<br>
especially the last, entirely satisfactory to the court that made them. They<br>
have been followed always most reluctantly, and with dissatisfaction. By no<br>
one was the correctness of them more questioned, than by the late chief jus-<br>
tice who gave them. It is within the knowledge of several of us, that he re-<br>
peatedly expressed regret that those decisions had been made, adding, when-<br>
ever the subject was mentioned, that if the point of jurisdiction was an original<br>
one, the conclusion would be different. We think we may safely assert that,<br>
a majority of the members of this court have, at all times, partaken of the same<br>
regret, and that whenever a case has occurred on the circuit, involving the<br>
application of the case of the *Bank* and *Deveaux*, it was yielded to, because<br>
the decision had been made, and not because it was thought to be right. We<br>
have already said that the case of the *Bank of Vicksburg* and *Slocomb* (14<br>
Peters), was most reluctantly given on mere authority. We are now called<br>
upon, upon the authority of those cases alone, to go further in this case than<br>
has yet been done. It has led to a review of the principles of all the cases.<br>
We cannot follow further; and, upon our maturest deliberation, we do not

CITY BANK<br>
*v.*<br>
HOUSTON.

CITY BANK
*v.*
HOUSTON.

think that the cases relied upon for a doctrine contrary to that which this court will here announce, are sustained by a sound and comprehensive course of professional reasoning. Fortunately a departure from them involves no change in a rule of property. Our conclusion, too, if it shall not have universal acquiescence, will be admitted by all to be coincident with the policy of the constitution and the condition of our country."

The act under consideration had but a short existence, but the exigencies of the future may require similar remedies to meet them; and it is, in a political point of view, extremely important to ascertain the extent of power vested in a *bankrupt court*, by the terms and provisions of this act, which may serve as a guide to be followed, or an example to be avoided, in future legislation.

Under the conclusions to which we have arrived, it is unnecessary to examine the other objections taken by the plaintiffs to the force and effect of the bankrupt proceedings, being of opinion that, so far as they affect the plaintiffs' mortgage, the court was without jurisdiction. The plaintiffs are entitled to judgment. It is therefore ordered and decreed that the judgment of the Commercial Court be avoided and reversed.

SLIDELL, J., dissenting. In dissenting from the opinion upon the question of jurisdiction adopted by all the other members of this court, it is due to candor and to the respect which I entertain for their judgment, to say, that my dissent is not dictated so much by weight of argument, as by the force of authority, and a consideration of the evils that would arise from overthrowing the doctrine established by the Supreme Court of the United States, and twice recognized by the former Supreme Court of this State. Were this question *res nova*, or even were the bankrupt law unrepealed, the inclination of my mind would be to concur on the main question with the opinion just pronounced by the chief justice, though I might differ as to some of the minor questions incidentally discussed.

I do not wish to be understood as recognizing unqualifiedly the rule of *stare decisis*. Indeed, the rule itself is not inflexible, nor absolute. Those who respect law *as a science would not* hold themselves bound in all cases by decisions, whether pronounced by themselves or others, which mature reflexion should demonstrate to be opposed to sound reason. To do so would be to prostrate the science itself, by excluding it from the career of progress and improvement which is open to every other, and forbidding it to accomodate itself to those changes of manners and institutions, some amalgamation with which is indispensable to its utility and even to its existence. To perpetuate error might, in some cases, be as unpardonable as to originate it: and hence the history of every jurisprudence exhibits decisions overthrown, and rules limited or abandoned. As was said by a learned author and very eminent judge: "The revision of a decision very often resolves itself into a mere question of expediency, depending upon the consideration of the importance of certainty in the rule and the extent of property to be affected by a change in it." Kent. vol. 1, p. 477.

The question of the jurisdiction of the District Court of the United States, under the bankrupt law, over the rights of a mortgagee who has not voluntarily submitted himself to its authority, is the only question determined by the majority of the court, and therefore the only one upon which I shall remark. Between the Supreme Court of the United States and the highest State tribunals there has long been established a system of reciprocal deference. While the Supreme Court of the United States has always professed the highest re-

spect for the decisions of State courts upon local laws; on the other hand it has been usual for the State tribunals to receive the construction given by the Supreme Court of the United States to the laws of the United States as their true construction. This rule, as may be gathered from a long series of decisions, and as is obvious to every mind, is founded upon the principle that, the judicial department of every government is the appropriate organ for construing the legislative acts of that government. If exceptions to this rule be made by State tribunals, it seems to me they should be limited to extreme cases, where either the error was too manifest to admit of doubt, or where the recognition of a principle established by the federal tribunal would necessarily involve, in the conscientious opinion of the State tribunal, the prostration of some vital constitutional right or function of State power, or a manifest usurpation of power by the general government.

It is admitted by the majority of the court that, the doctrinal opinion of the Supreme Court of the United States, in *Ex parte Christy*, 3 Howard, supports the jurisdiction of the United States District Court to the extent contended for by the counsel for the appellees, and is affirmed by that court in *Nugent's Case*, 3 Howard. This admission is undeniably just. I have examined, with great care, the masterly brief presented in this cause by the counsel for the appellants. One of those learned counsel argued before the Supreme Court of the United States the cases of *Christy* and of *Nugent*. On the question of jurisdiction the identical points seem to me to have been raised, and the identical authorities to have been cited in *Christy's* case, which are now submitted to us. Those points and authorities were elaborately examined and replied to, if not answered, by Judge Story; on every essential point the opinion was adverse.

It is urged, however, that the circumstances under which the opinion was pronounced, were such as to withhold from it the force of authority. It is true that the case was one of an application for a prohibition; that the Supreme Court of the United States declared itself without jurisdiction to issue the writ, and that the decision of that point only was indispensable. Under ordinary circumstances, what was said by the court on the question of jurisdiction now presented to us, might be regarded as *obiter dictum*. But we cannot close our eyes to the remarkable fact that, the discussion of the jurisdiction of the District Court of the United States, of its organization and powers under the bankrupt law, and of the scope and meaning of that statute, occupies thirteen pages of the printed opinion, while the power of the Supreme Court to issue the writ of prohibition is disposed of in as many lines. For a course so novel in judicial exposition, it would be disrespectful to that high tribunal to suppose they had no adequate reason. That reason must at once suggest itself to every mind. The true interpretation of the bankrupt law was a subject of great moment; great conflict of opinions had arisen in the courts of the States, and in the inferior courts of the United States. Under the judicial organization of the District Court under the statute of 1841, there was no appeal from that court to the Supreme Court, and yet even the extrajudicial opinion of the Supreme Court, in this state of conflicting decisions, was eagerly desired by the bench and bar throughout the United States. Under such circumstances that opinion was elaborately given, after solemn argument, and its expositions cannot be treated as *obiter dicta*.

Subsequently, in *Nugent's* case, the same learned counsel renewed the discussion. The chief justice, who then acted as the organ of the court, apparently

City Bank
*v.*
Houston.

CITY BANK
v.
HOUSTON.

*ex diligentia,* and to give additional force, if necessary, to the opinion in *Christy's* case, recited in full the opinion of the circuit judge. That opinion contains, among others, the views of the circuit judge upon a point of legislative expediency. "I agree fully in the opinion," says Judge McKinley, "that upon the ground of expediency, the jurisdiction of the District Court of the United States over all the property of the bankrupt, mortgaged or otherwise, should be exclusive; but I do not understand the bankrupt law to render it so." But he also says: "I wish it, however, to be distinctly understood, that I am fully of opinion that the District Court of the United States is *vested with jurisdiction over mortgaged property belonging to the bankrupt,* and that, when a proper case is shown, *it has power to foreclose a mortgage,* and to do all other acts necessary to bring about a final distribution and settlement of the bankrupt estate." After inserting this opinion at length, the chief justice proceeds: "We have inserted the whole of this decree, because we think the court were not only right in dismissing the bill, but, with a *single* exception, we concur also in the principles and reasoning on which the learned judge founded his decision. The exception to which we allude is, that part of the decree in which he expresses his opinion that, upon the ground of expediency, the jurisdiction of the District Court of the United States over all the property of the bankrupt, mortgaged or otherwise, should be exclusive, so as to take away from the State courts any jurisdiction in such cases. Upon that subject it is not our province to decide, and we have no desire to express an opinion upon it. But, in every other respect, the decree conforms to the opinion delivered by this court at the present term, upon the motion for a prohibition in the case *Ex parte the City Bank of New Orleans, in the matter of Wm. Christy, assignee of Daniel T. Walden, a Bankrupt,* v. *The City Bank of New Orleans. In that case, the opinion of this court in relation to the jurisdiction of the District Court in matters of bankruptcy, has been fully expressed, and need not be repeated here;* and, according to the principles therein stated, the decree of the Circuit Court in this case must be affirmed."

The substance of these decisions, I understand to be, that the District Court of the United States has jurisdiction over mortgages, and when, in its discretion, that jurisdiction is exercised, it may, by summary proceedings, bring the mortgagees before it, decree a sale, settle the rank of creditors, and distribute the proceeds; protecting, however, in such distribution the rights of the mortgagees, as they would be protected in the State Courts, and distributing the residue among the ordinary creditors; that this jurisdiction is not exclusive, and, that if not exercised by the United States Court, a mortgagee, who has not come into the bankrupt court, may proceed in the State court to the foreclosure of his mortgage and sale of the mortgaged property. It will be observed that this doctrine protects the two classes of titles, those acquired by sales under State process, and those made under decrees of the bankrupt court.

Now, when we recollect that the bankrupt law went into effect in February, 1842; that the rules of the District Court of the United States upon the subject matter of mortgages, were adopted in October, 1842; that, in April, 1843, the Circuit Judge for Louisiana recognized their legality, and the jurisdiction of the District Court over mortgaged property and mortgagees; that the Supreme Court of the United States and the former Supreme Court of Louisiana, have each twice recognized the same doctrine; that property of great value has been sold and under numerous decrees of the District Court; that the bankrupt law

CITY BANK
v.
HOUSTON.

has been repealed, and the great mass of bankrupt estates administered; it seems to me too late for a court in Louisiana to entertain the question of jurisdiction.

By reason of the repeal of the bankrupt law, we are sitting here to adjudicate upon the past. Were that law unrepealed, and the opinion expressed by authority so high manifestly erroneous, it might be said that the importance of avoiding future error should outweigh the danger of unsettling established landmarks, and disturbing important rights, which parties, under the sanction of the highest judicial authority, supposed they had acquired. But such is not the case. The doors of the bankrupt court have long since been closed to new applicants, and the administration of the great mass of estates under their charge has been consummated. The future is not before us. It is true that the decision now rendered, if affirmed, might, as suggested by the court, be a beacon to the future legislator; but it appears to me that the conflict of decisions, which has already occurred, would be an ample warning to that department of the government, should they ever think proper again to exercise that branch of their constitutional power.

From having had considerable opportunity of observing the course of procedure in the District Court of the United States for this State, it is to my personal knowledge not only that mortgaged property of great value was sold under its decrees, but that, in very many cases, mortgagees who were cited, unless they held an early rank, made no appearance, and did no acts which could be construed into a personal ratification of the sales made, or even affect them with bad faith. The door which will be thrown open by this decision to vexatious litigation, will be a very wide one. The bankrupt law itself is considered by many as having been pregnant with evil; and if it be, at this late day, declared that the District Court was without jurisdiction over mortgaged property and mortgagees, an additional and fruitful source of evil will be opened.

For the grave reasons above stated I feel bound, on this question of jurisdiction, to submit my own doubts to the force of authority, and stand upon what has been solemnly decided.

In these brief remarks I have confined myself solely to the question of jurisdiction, because that is the only question really involved in the opinion of the majority of the court. I have considered that it would be superfluous, at present, to say any thing on the questions of citation and nullity, and the very important question of subrogation, and other equities in favor of these purchasers, or other parties interested.